# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SARAH TONEY,                                )
                                            )
    Plaintiff,                        )
                                            )    **No. 13 C 42**
    v.                                )
                                            )    **Chief Judge Rubén Castillo**
QUALITY RESOURCES, INC., et al.,            )
                                            )
    Defendants.                       )

## MEMORANDUM OPINION AND ORDER

Plaintiff Sarah Toney ("Toney") moves for class certification pursuant to Federal Rule of Civil Procedure 23 in her action alleging that Quality Resources, Inc. ("Quality") and its sole owner, Cheryl Mercuris ("Mercuris"),[1] (collectively, the "Defendants") violated the Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227. (R. 313, Fourth Am. Compl.; R. 372, Nov. 17, 2017, Mot. for Class Certification.) For the reasons stated below, Toney's motion is granted as set forth herein.

---

[1] Defendants admit that Cheryl Mercuris is Quality's sole owner. (R. 329, Answer to Fourth Am. Compl. ¶ 10.)

# RELEVANT FACTS[2]

On December 8, 2012, Toney purchased slippers online from Infomercials, Inc., d/b/a "Stompeez." (R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 4.) The online order form on Stompeez's website required a Stompeez costumer to submit his or her phone number "for questions about [the] order." (R. 329, Answer to Fourth Am. Compl. ¶ 37.) Toney completed the online form and submitted her phone number. (*Id.*)

Stompeez's website also had a privacy policy, which provided that "the information we collect is used to communicate with you about your product orders and shared with other organizations to help them contact consumers by e-mail and/or telephone for marketing purposes." (R. 149, Pl.'s Resp. to Defs.' Statement of Material Facts at 2-3 (internal alterations and emphasis omitted).) The policy also stated that "by using any of the Websites, you signify that you have read, understand and agree to be bound by this Privacy Policy." (*Id.* at 3 (internal alteration omitted).)

On December 10 and 11, 2012, Quality called Toney through an automated dialer as part of its telemarketing business. (R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 4-5, 7-9; R. 329, Answer to Fourth Am. Compl. ¶¶ 51-52, 54; R. 251-3, Quality 30(b)(6) Dep. Tr. at 140-41.) During those calls, Quality offered Toney a product by the name of "Budget Savers," which is a product sold by Sempris, LLC that offers discounts on entertainment, dining, travel, and other

---

[2] For her factual narrative, Toney relies on the exhibits attached to her motion for class certification, which include: (a) a call script Quality used in its telemarketing campaign (R. 373-1); (b) a transcription of Quality's call to Toney prepared by her counsel (R. 373-2); (c) complaints filed with the U.S. Federal Trade Commission's National "Do Not Call Registry" (R. 372-3); (d) a chart that tracks complaints about Quality's business (R. 373-3); (e) the expert report of Jeffery Hansen, Toney's expert (R. 372-5); (f) the class list (R. 379); (g) Quality's responses to Toney's first discovery requests (R. 373-4); and (h) declarations of Toney's attorneys that detail their legal experience (R. 372-8). Toney also relies on Quality's Rule 30(b)(6) deposition transcript. (*E.g.*, R. 372, Nov. 17, 2017, Mot. for Class Certification at 8.) Defendants rely on the parties' Local Rule 56.1 statements of material facts filed in this case, as well as filings in the Court record from earlier proceedings such as an expert report Defendants previously filed in this case, (R. 345-1). (R. 382, Resp. at 1, 5.)

purchases for a monthly fee. (R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 4-5; R. 251-3, Quality 30(b)(6) Dep. Tr. at 11-12, 141-42.)

Stompeez sold its customers' telephone information to Quality for $1.50 per customer. (R. 251-3, Quality 30(b)(6) Dep. Tr. at 81.) Quality, in turn, had a contract with Sempris, under which Quality would call Stompeez customers to market Sempris' products, such as Budget Savers. (R. 329, Answer to Fourth Am. Compl. ¶¶ 57-61, 64-65; R. 251-3, Quality 30(b)(6) Dep. Tr. at 11-12, 136-40.) Quality placed marketing calls through a computerized program called "VICI Dial," which automatically dials telephone numbers inputted into the program, and, once a person answers a call, the call is routed to a Quality employee or representative. (R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 7-8, 12; 251-3, Quality 30(b)(6) Dep. Tr. at 22-23.)

Quality developed a script to market Budget Savers that it adhered to on its telemarketing calls. (251-3, Quality 30(b)(6) Dep. Tr. at 72-74; R. 373-1, Telemarketing Script.) Quality would first verify a Stompeez costumer's online purchase, then market Budget Savers, and then market a second product if the customer accepted Quality's offer for Budget Savers. (R. 251-3, Quality 30(b)(6) Dep. Tr. at 97-98.) Quality placed thousands of automated calls, and its telemarketing operation resulted in at least 500 complaints from 2008 to 2013, which Quality tracked internally. (R. 373-3, Quality "Complaint Chart"; R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 8-9.)

Quality produced its outgoing call data to Toney, which Toney provided to her expert, Jeffery Hansen. (R. 372-5, Hansen Report at 23-24.) From this data, Hansen opines that Quality called 35,191 unique cell phone numbers. (*Id.*) Toney offers, as a "class list," a list of 35,191 unique cell phone numbers that Quality called. (R. 372, Nov. 17, 2017, Mot. for Class Certification at 13, 15.)

# PROCEDURAL HISTORY

This action began on January 3, 2013, when Toney filed her first class action complaint alleging violations of the TCPA. (R. 1, Compl.) Toney then amended her complaint several times, (R. 26, Am. Compl.; R. 60, Second Am. Compl.; R. 133, Third Am. Compl.), filed motions for class certification, (R. 4, Jan. 3, 2013, Mot. for Class Certification; R. 63, Refiled Mot. for Class Certification), and District Judge John F. Grady subsequently stayed the action pending mediation, (R. 128, Min. Entry). In the middle of 2014, the stay was lifted and the case was then reassigned to District Judge Amy St. Eve. (R. 132, Min. Entry (lifting the stay); *compare* R. 129, Tr. (indicating that Judge Grady presided over the case in the Spring of 2014), *with* R. 138, Min. Entry, *and* R. 147, Min. Entry (indicating that Judge St. Eve presided over the case in the Summer of 2014).)

On August 21, 2014, Quality moved to dismiss and for summary judgment on the claims in the operative complaint at the time, the Third Amended Complaint. (R. 140, Mot. to Dismiss.) On December 1, 2014, Judge St. Eve denied Quality's motion. (R. 168, Mem. Op. at 1.)

In a memorandum opinion, Judge St. Eve rejected Quality's argument that Toney failed to state a claim for TCPA violations, and found that Toney sufficiently put each defendant on notice of her TCPA claims. (R. 168, Mem. Op. at 6-7.) Quality also argued that Toney indisputably consented to its telephone calls, which merited dismissal or summary judgment against Toney on her claims. (*Id.* at 7-15.) Judge St. Eve disagreed, ruling that Toney sufficiently alleged that the scope of her consent to Quality's calls was limited to questions about an online order and did not include consent to receive a telemarketing call for another party's product. (*Id.* at 15.) Judge St. Eve also rejected Quality's argument that it procured Toney's consent to telemarketing calls through the privacy policy on Stompeez's website, reasoning that Quality

failed to submit any evidence indicating that Toney saw the privacy policy or agreed to it. (*Id.* at 15-17.) Judge St. Eve also reasoned that the privacy policy did not clearly provide that Toney could be contacted for marketing by third parties. (*Id.*) Therefore, Judge St. Eve concluded that dismissal or summary judgment was not appropriate at the pleadings stage. (*Id.* at 15.) Two weeks after this opinion, on December 15, 2014, this case was reassigned to yet another judge, District Judge Milton Shadur. (R. 170, Executive Committee Order (reassigning case to Judge Shadur).)

On October 28, 2015—almost a year after the decision on Quality's motion to dismiss and for summary judgment—Toney again moved for class certification. (R. 213, Mot.) On November 13, 2015, Judge Shadur denied that motion without prejudice, and, on December 1, 2015, subsequently stayed the case pending the U.S. Supreme Court's rulings related to Article III standing in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), *as revised* (May 24, 2016) and *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016), which Judge Shadur reasoned could potentially affect Toney's standing. (R. 224, Min. Entry; R. 225, Mot. to Stay; R. 230, Min. Entry (granting motion to stay); R. 231, Tr. at 6-8.) The case then largely remained inactive until July 5, 2016, at which time Toney filed a motion seeking preliminary approval of a class action settlement between Toney and the class on the one hand, and then-Defendant Sempris on the other. (R. 241, Mot. for Prelim. Approval of Class Action Settlement.) That motion also sought certification of the settlement class, which Toney defined as:

> All persons who are or were the subscribers and/or customary users of the telephone numbers on the Class List, and to whom, from January 3, 2009 through the date of preliminary approval, Quality Resources, Inc., made a call or calls in connection with Stompeez Kids Slippers purchases. The following persons are excluded from the Settlement Class: Sempris, any parent, subsidiary, or affiliate of Sempris, the officers, directors, agents, servants, or employees of any of the foregoing as of the entry of the Preliminary Approval Order, Class Counsel, the Settlement Administrator, the Mediator, and any judge presiding over the Action.

(*Id.* at 4.) On August 16, 2016, Judge Shadur granted preliminary approval of the settlement, accepting Toney's proposed class definition for settlement purposes. (R. 267, Prelim. Approval Order at 2-3.)[3]

On September 22, 2016, Toney filed her fourth amended complaint, which is currently the operative complaint in this case. (R. 291 and R. 313, Fourth Am. Compl.) It alleges that Defendants and Sempris violated the TCPA by making unsolicited telemarketing calls to phone numbers on the national "Do Not Call Registry," and that they also violated the TCPA by using an automated dialer to call cell phones as part of a telemarketing campaign. (*Id.* ¶¶ 95-128, 182-215.) Toney also claims that Defendants orchestrated fraudulent transfers of Quality's assets to Mercuris, rendering Quality unable to satisfy a potential judgment in this case. (*Id.* ¶¶ 129-45.) Finally, Toney claims that Mercuris is personally liable for Quality's conduct, and that Defendants are in breach of an indemnity agreement with Sempris that allegedly requires Quality to pay for Sempris' attorney's fees and provide funds to satisfy any amounts owed to Toney and the settlement class as a result of Sempris' settlement in this case. (*Id.* ¶¶ 146-81.)

On December 1, 2016, Judge Shadur issued an order granting final approval of the Sempris settlement. (R. 312, Final Approval Order.) Judge Shadur ruled that the Sempris settlement was fair, reasonable, and in the best interest of the settlement class, and Judge Shadur entered final judgment dismissing Sempris from the case with prejudice. (*Id.* at 2-5.) Judge Shadur also ruled in the same order that the settlement class satisfied Rule 23's class certification

---

[3] On August 29, 2016, Judge Shadur issued an amended preliminary approval order with the same settlement class definition. (R. 267, Am. Prelim. Approval Order 2.) The amended order simply corrected a clerical error related to certain dates referenced in the initial preliminary approval order. (R. 278, Tr. at 15-16.)

requirements. (*Id.* at 3.) Following Sempris' dismissal, the only Defendants remaining in this case are Quality and Mercuris.[4] (*See* R. 313, Fourth Am. Compl.)

After Judge Shadur's approval of the Sempris settlement, Toney moved again for class certification on January 6, 2017. (R. 318, Jan. 6, 2017, Mot. for Class Certification.) On August 15, 2017, Judge Shadur, contemplating retirement, granted Toney's motion for class certification in a short, two-page order, so as not to "shift the responsibility for the class certification decision to an assignee judge who would be required to start from scratch[.]" (R. 363, Order at 2.)

This Court expressly commends Judge Shadur's attempt to manage this difficult litigation while battling medical issues that ultimately took his life on January 15, 2018. Judge Shadur was the longest serving senior judge on this Court. As a senior judge, he essentially worked as a pro bono judge.

The case was reassigned to this Court on August 28, 2017, and, on October 12, 2017, the U.S. Court of Appeals for the Seventh Circuit reversed and remanded Judge Shadur's August 15 order granting class certification. (R. 364, Executive Committee Order; R. 369, Seventh Circuit Order.) The Seventh Circuit observed that "[i]nstead of engaging in analysis under Federal Rule of Civil Procedure 23, the district court granted class certification based on 'the reasons advanced by Toney in her original motion and in her reply' concluding that 'there is really no need to repeat here the arguments powerfully presented in both those submissions.' " (*Id.* at 2.) The Seventh Circuit rejected Judge Shadur's heavy reliance on his prior order granting class certification for the Sempris settlement, reasoning that the proposed classes for the Sempris settlement and in Toney's motion for class certification "are not described exactly the same way, however, and so the exact parameters of the class remain unclear." (*Id.*) Thus, the Seventh

---

[4] Toney added Mercuris as a Defendant in its fourth amended complaint upon learning that Quality allegedly had no assets to satisfy a potential judgment in this case. (*See* R. 285, Tr. at 14-22.)

Circuit ordered this Court to "explicitly define the class and provide a fuller discussion of its analysis under Federal Rule of Civil Procedure 23." (*Id.*)

On November 17, 2017, Toney then filed the motion for class certification that is now before this Court. (R. 372, Nov. 17, 2017, Mot. for Class Certification.) Therein, Toney seeks certification of the following class pursuant to Rule 23(b)(3):

> All persons who are or were the subscribers of the telephone numbers on the Class List, and to whom, from January 3, 2009 through the date of preliminary approval,[5] Quality Resources, Inc., made a call or calls through its Vicidial calling system on their cellular telephones promoting Sempris goods, and where the cell phone number was obtained as a result of a transaction at the website www.stompeez.com. The following persons are excluded from the Class: Quality, any parent, subsidiary, or affiliate of Quality, Ms. Mercuris and the officers, directors, agents, servants or employees of Quality as of the entry of the Preliminary Approval Order, Class Counsel, and any judge presiding over the Action.

(*Id.* at 1-2.) Toney argues that the legal and factual issues common to all class members are: whether the automated dialer used by Quality to call Toney and others similarly situated was prohibited by the TCPA, and whether providing one's telephone number as part of an online transaction for "questions about the order" can constitute consent to receive marketing calls unrelated to the order from a third party. (*Id.* at 2.) Thus, Toney contends that this case satisfies all of the requirements under Rule 23(a) for class certification: numerosity, commonality, typicality, and adequacy. (*Id.* at 3.) She also argues that this case satisfies the requirements of 23(b)(3) because common questions of law and fact predominate among the class members and because a class action is the best way to efficiently adjudicate this case. (*Id.* at 19-24.) Toney submits that the Court should certify the proposed class because it is almost the same as the Sempris settlement class that Judge Shadur previously certified. (*Id.* at 1 n.1, 3, 12-14, 18, 23.)

---

[5] The Court understands this date to be August 16, 2016, the date Judge Shadur entered the preliminary approval order for the Sempris settlement. (R. 267, Prelim. Approval Order.)

In response, Defendants argue that the class is not ascertainable because Toney's expert has failed to employ a reliable methodology to identify the exact persons that Quality called. (R. 382, Resp. at 11-15.[6]) Defendants also maintain that the issue of whether persons in the class consented to Quality's telephone calls, by way of Stompeez's online privacy policy or other means, is a highly individualized issue, incapable of being resolved as a class action. (*Id.* at 15-27, 32-33.) Defendants contend that there are other individualized issues that cannot be resolved on a class-wide basis, such as whether Defendants acted "knowingly" or "willfully" and whether Mercuris can be held personally liable for Quality's conduct. (*Id.* at 27.) Finally, Defendants argue that Toney's motion must fail because she provides no evidence that Quality's automated dialer satisfies the TCPA's definition of an "automated telephone dialing system" ("ATDS"). (*Id.* at 27-29.)

## LEGAL STANDARD

In order to grant class certification under Rule 23, the Court must be "satisfied, after a rigorous analysis" that the Rule's requirements are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (citation omitted). "Failure to meet any of the Rule's requirements precludes class certification." *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 513 (7th Cir. 2009) (citation omitted). Satisfaction of these requirements, on the other hand, categorically entitles a plaintiff to pursue her claim as a class action. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398-99 (2009).

Toney bears the burden of proving each disputed requirement by a preponderance of the evidence. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015); *see also Chapman v.*

---

[6] The Court refers to Defendants' corrected response (R. 382, Resp.) to Toney's motion for class certification, which adds a table of contents that was missing in its initial response but is the same as the initial response in all other respects. (R. 383, Notice.)

*Wagener Equities, Inc.*, No. 09 C 07299, 2014 WL 540250, at \*4 (N.D. Ill. Feb. 11, 2014) (observing that plaintiffs "need not make" their class certification showing "to a degree of absolute certainty"). As such, "[o]n issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "If there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class." *Id.* (citation and internal quotation marks omitted). A court must therefore "make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see also Wal-Mart*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."). District courts have broad discretion in determining whether a plaintiff has satisfied her burden of establishing the requirements for class certification. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979); *Messner*, 669 F.3d at 811.

## ANALYSIS

To prevail on a motion for class certification, a plaintiff must demonstrate first, pursuant to Rule 23(a), that:

> (1) the class is so numerous that joinder of all members is impracticable (numerosity);
> (2) there are questions of law or fact common to the class (commonality);
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and
> (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

*Bell*, 800 F.3d at 373 (citation omitted); *see also* FED. R. CIV. P. 23(a).

Second, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart*, 564 U.S. at 345; *see also* FED. R. CIV. P. 23(b). Out of these three requirements, Toney argues that class certification is appropriate under Rule 23(b)(3). (R. 372, Nov. 17, 2017, Mot. for Class Certification at 3.) A court may certify a Rule 23(b)(3) class where "questions of law and fact common to members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

Separate and apart from the above requirements in Rule 23(a) and (b)(3), "a class must be sufficiently definite that its members are ascertainable." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) ("The plaintiff must also show . . . that the class is indeed identifiable as a class."). Defendants argue that the proposed class cannot be ascertained, and that Toney fails to satisfy Rule 23's requirements. (R. 382, Resp. at 1-3.) The Court first addresses the threshold issue of whether the class is ascertainable, and then addresses whether Toney satisfies the requirements for class certification under Rule 23(a) and (b)(3).

## I.   Whether the Class is Ascertainable

### A.   Hansen's Report

As a preliminary matter, Defendants argue that Toney's proposed class is not ascertainable because her expert, Jeffery Hansen, fails to reliably identify the persons subscribed to the unique cell phone numbers that Quality called. (R. 382, Resp. at 11-15.) Defendants, therefore, contend that Hansen's report is inadmissible under the Federal Rules of Evidence as construed by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993). (*Id.* at 15.) "When an expert's report or testimony is critical to class certification,

[the Seventh Circuit has] held that a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner*, 669 F.3d at 812 (citation and internal quotation marks omitted). Even when "a district court has doubts about whether an expert's opinions may be critical for a class certification decision, the court should make an explicit *Daubert* ruling." *Id.* Thus, before reaching the merits of whether Toney's proposed class is ascertainable, the Court first considers whether Hansen's report is admissible.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert. C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). "In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (citation and internal quotation marks omitted). "[T]he district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony. Steps one and three are not at issue" *Id.* (emphasis in original).

"A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). "If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *Id.* (quoting *Daubert*, 509 U.S. at 596). The Court is given "wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Id.* (citation omitted);

*see also C.W.*, 807 F.3d at 834-35 (ruling that the "district court is the gatekeeper of expert testimony" and that an expert's "reliability is determined on a case-by-case basis"). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "[R]ejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702, advisory committee notes (2000 Amendments).

### 1.    Hansen's Qualifications

Defendants do not attack Hansen's qualifications as an expert witness, but instead argue that he has not employed a reliable methodology to support his findings regarding the unique cell phone numbers Quality called through its telemarketing campaign. (R. 382, Resp. at 1, 12-15.) Nevertheless, the Court finds that Hansen is qualified to offer expert testimony on this subject.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citation omitted). An expert may be qualified by "knowledge, skill, experience, training, or education[.]" FED. R. EVID. 702. "While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert . . . Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience[.]" *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (internal citations omitted). "Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.*

Hansen is a consultant in the private sector who advises companies using automated dialers, and has served as an expert witness or consultant in more than 100 TCPA class action lawsuits. (R. 372-5, Hansen Report at 2-3.) In this capacity, he has assembled, configured, maintained, and operated automated dialers. (*Id.*) He has himself set up and maintained automated dialers capable of generating over 1 million calls per hour, and has trained others on how to use and maintain such systems. (*Id.* at 3.) Hansen also has experience in the use of outgoing call lists in the telemarketing industry and how to use cell block identifier[7] and ported number lists[8] to identify phone numbers that are associated with a cell phone. (*Id.*) The Court concludes that, based on his vast experience with automated dialers and in identifying cell phone numbers, Hansen is qualified to testify as an expert on the unique cell phone numbers Quality called in its telemarketing campaign.

### 2.     Hansen's Methodology

To determine which phone numbers on Quality's outgoing call log were cell phone numbers, Hansen used publicly available cell block identifier lists to identify phone numbers assigned to cell phones. (R. 372-5, Hansen Report at 23.) He also compared Quality's outgoing call data with ported number lists, or lists showing phone numbers transferred from landline use to cell phone use. (*Id.* at 23-24.) Hansen represents that this method is typically used in the telemarketing industry to identify cell phone numbers. (*Id.* at 3.) Defendants argue that this methodology is not sufficiently reliable to satisfy the criteria for admissibility of expert testimony under the Federal Rules of Evidence and *Daubert*. (R. 382, Resp. at 12-15.)

---

[7] "Cell block identifiers" are a combination of numbers within a phone number that are assigned exclusively to cell phone numbers. (R. 372-5, Hansen Report at 23.)

[8] A "ported number list" is a list of phone numbers that have been converted from landline use to cell phone use. (R. 345-1, Sponslor Report at 9 n.1; *see also* R. 372-5, Hansen Report at 23.)

To be reliable, the expert's opinion must be "reasoned and founded on data," and must also "utilize the methods of the relevant discipline." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). "An expert's testimony is not unreliable simply because it is founded on his experience rather than on data[.]" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Rule 702, requires, however, "that the expert explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.' " *Id.* (citation omitted). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (citation omitted)). "The district court usurps the role of the jury," however, "and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). "The focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). Along those lines, " 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616.

Hansen relies on a method of identifying cell phone numbers that he represents is accepted within the telemarketing industry. (R. 372-5, Hansen Report at 3.) Defendant's rebuttal expert, Ken Sponslor, who is also a telemarketing industry consultant, opines that Hansen's results are incorrect. (R. 345-1, Sponslor Report at 8-10.) Sponslor, however, does not dispute that the use of cell block identifier and ported number lists are accepted within the industry to distinguish cell phone numbers from landline numbers. (*See id.* (opining that it is unlikely Hansen was able to accurately identify unique cell phone numbers from Quality's call log data

because cell block identifier and ported number lists are regularly revised).) Accordingly, the Court finds that Hansen's methodology satisfies Rule 702 and *Daubert* because it is founded on Quality's outgoing call data, cell block identifier lists, and ported number lists, and because Hansen utilizes a method accepted within the telemarketing industry. *See Bielskis*, 663 F.3d at 894.

In the same vein, the Court rejects Defendants' remaining challenges to Hansen's methodology. Defendants largely rely on Sponslor's rebuttal opinion to attack Hansen's methodology. (R. 382, Resp. at 1, 14-15.)[9] Sponslor's opinions, like Hansen's, are based on his experience in the telemarketing industry and in TCPA compliance consulting. (R. 345-1, Sponslor Report at 7.)

First, Sponslor opines that cell block identifier lists are updated twice a month, and that ported number lists are likewise updated regularly. (*Id.* at 9.) Thus, if Hansen used current rather than historical versions of the cell block identifier and ported number lists, Sponslor opines that his "results" would be "unreliable and incorrect" or "highly suspect." (*Id.* at 9-10.) This opinion, however, misses the mark by casting doubt on Hansen's "results" instead of his methodology. *See Chapman*, 297 F.3d at 687. Sponslor at best raises the possibility that Hansen used an accepted methodology but flawed assumptions related to the correct cell block identifier and ported number lists that must be compared to Quality's outgoing call data, which would be a

---

[9] The only notable argument Defendants advance in addition to Sponslor's arguments is that Hansen does not identify the "relevant period" Hansen describes when Hansen says he "identified cellular phone numbers from two sets of outbound call data placed during the relevant period." (R. 382, Resp. at 13.) This, however, does not go to the reliability of Hansen's methodology of using cell block identifiers and ported number lists to determine which telephone numbers were cell phone numbers. Additionally, the "relevant period" Hansen refers to is reasonably understood as the time period reflected in Quality's outgoing call data, which is the date of the first call on Quality's outgoing call log up until the date of the last call on the call log, a document that Quality produced to Toney and from which Quality could easily ascertain Hansen's "relevant period."

flaw that goes to the weight of Hansen's opinion, not its admissibility. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 767 (7th Cir. 2013) (reversing district court's exclusion of expert testimony where the "judge agreed that [the expert] correctly employed a valid methodology" and should "have let the jury determine how the uncertainty" about the expert's assumptions "affected the weight of [the expert's] testimony"); *Manpower*, 732 F.3d at 808 ("[A]rguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury."); *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2016 WL 3030256, at *11 (W.D. Wash. May 25, 2016), *order clarified by*, No. C13-1533JLR, 2016 WL 3620798 (W.D. Wash. June 28, 2016) (finding that the plaintiffs established, on summary judgment, that the defendant placed 601,207 calls to cell phone based on Hansen's methodology of comparing outgoing calls to "to a cell block identifier list . . . and to ported number lists[.]"). The Court, therefore, will not exclude Hansen's opinion based on Sponslor's opinion that Hansen possibly failed to use the correct cell block identifier and ported number lists in his analysis.[10]

Second, Sponslor opines that there are few resources available to match historical cell phone numbers to their users or subscribers. (*Id.* at 10-22.) This opinion, however, does not directly address Hansen's opinion, which concerns whether a particular phone number is a landline phone number or a cell phone number. (R. 372-5, Hansen Report at 23 ("I was able to determine calls to wireless numbers and unique wireless numbers . . . using a publicly available cell block identifier list[.]").) Sponslor, on the other hand, opines on Hansen's ability to match a particular person to a particular phone number, which, instead of casting doubt on Hansen's

---

[10] Sponslor does not opine that Hansen did in fact use current cell block identifier and ported number lists, but bases his conclusions on the possibility that Hansen may have used the wrong lists for comparison. (R. 345-1, Sponslor Report at 9 ("*If* Mr. Hansen used a current-day version of the Ported Number List, his results would be highly suspect." (emphasis added)).)

opinion, attempts to cast doubt on the feasibility of ascertaining the identity of individuals in Toney's proposed class. (*Id.* at 10-22 (opining that name directories, commercial research databases, and other resources cannot reliably identify the person using a particular cell phone number).) Accordingly, the Court rejects Defendants' challenges to Hansen's methodology.

### 3. Assistance to the Trier of Fact

Last, the Court considers whether Hansen's opinion "assists the trier of fact in understanding the evidence or determining a fact in issue." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001); *see also Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014) ("The rubric for evaluating the admissibility of expert evidence considers whether . . . the testimony would have assisted the trier of fact[.]"). "An expert must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury." *Dhillon*, 269 F.3d at 871 (citation, alterations, and internal quotation marks omitted); *see also Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690, at *6 (N.D. Ill. July 17, 2014) ("Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." (citation and internal alteration omitted)).

Toney alleges that Defendants violated the TCPA by placing calls through an ATDS to Toney's and proposed class members' cell phones without their consent. (R. 313, Fourth Am. Compl. ¶¶ 114-28.) Thus, to prevail on her claim, she will have to establish that Defendants placed a call "using any automated telephone dialing system ('autodialer') to any telephone number assigned to a . . . cellular telephone service." *Blow v. Bijora*, Inc., 855 F.3d 793, 798 (7th Cir. 2017) (citation and internal alteration omitted) (quoting 47 U.S.C. § 227(b)(1)(A)(iii)). A jury or other factfinder is not capable of discerning on their own whether a particular telephone

number that Quality called is assigned to a cell phone. The Court, therefore, concludes that Hansen's testimony will assist the trier of fact in determining facts at issue. Accordingly, Hansen's expert opinion is admissible under Rule 702 and *Daubert*.

### B.    Whether the Proposed Class is Ascertainable

Turning now to whether Toney's proposed class is ascertainable, Defendants argue that Toney fails to demonstrate that her proposed class is sufficiently definite to identify class members through objective criteria. (R. 382, Resp. at 12.) The Court does not find this argument persuasive.

"Rule 23 requires that a class be defined, and experience has led courts to require that classes be defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). Whether a class is ascertainable depends on "the adequacy of the class definition itself," not "whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Id.* at 658. Accordingly, this inquiry does not require Toney to demonstrate that "there is a 'reliable and administratively feasible' way to identify all who fall within the class definition." *Id.* at 657-58 (declining to follow the U.S. Court of Appeals for the Third Circuit's heightened "ascertainability" requirement in which courts must examine at the class certification stage "the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit"); *see also Johnson v. Yahoo!, Inc.*, No. 14 CV 2028, 2016 WL 25711, at *2 (N.D. Ill. Jan. 4, 2016) ("In *Mullins*, the Seventh Circuit made clear that, at this stage of the litigation, a plaintiff need not prove there is a reliable and administratively feasible way to identify all who fall within the class definition."). Instead, for Toney's class to be ascertainable, it cannot be defined too vaguely, defined by subjective criteria, or defined in terms of success on the merits thereby creating a "fail-safe class." *Mullins*, 795 F.3d at 659-60.

Toney's proposed class includes persons who are or were subscribers of cell phone numbers on the class list and whose cell phone numbers Quality obtained as a result of their online purchase on Stompeez's website. (R. 372, Nov. 17, 2017, Mot. for Class Certification at 1-2.) The class is refined further to include only those persons whose cell phone Quality called during the time period from January 3, 2009, through August 16, 2016, using an ATDS and to promote Sempris products. (*Id.*) There is nothing vague or subjective about this definition— whether a person subscribed to a cell phone number on the class list, received a call on her cell phone from Quality through an ATDS, or was marketed Sempris products are all objective criteria. *Compare Rock v. Nat'l Collegiate Athletic Ass'n*, No. 112CV01019TWPDKL, 2016 WL 1270087, at *7 (S.D. Ind. Mar. 31, 2016) (ruling that a proposed class was vague and subjective when it hinged on whether an athlete was "recruited" by a particular school because it depended "on the substance of the conversations between a prospective student-athlete and a representative from the school" and the school "showing an economic interest" or taking "some sort of tangible action"), *with Wright v. Nationstar Mortage LLC*, No. 14 C 10457, 2016 WL 4505169, at *4 (N.D. Ill. Aug. 29, 2016) ("Because members belong to the class if they are on a list in Nationstar's records, it is possible to identify class members without any subjective criteria.").

Nor is Toney's proposed class a "fail-safe class," which occurs when "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825; *see also Mauer v. Am. Intercontinental Univ., Inc.*, No. 16 C 1473, 2016 WL 4698665, at *3 (N.D. Ill. Sept. 8, 2016) ("The Court agrees that, as currently defined, [the plaintiff's] class poses fail-safe problems: whether an individual qualifies as a class member turns on consent and so membership in the class depends on the presence of a valid claim against Defendants."). Here, liability and class membership are not coterminous. The

TCPA imposes liability on those who call a cell phone using an ATDS without the cell phone subscriber's "prior express consent." 47 U.S.C. § 227(b)(1)(A)(iii). Membership in Toney's proposed class, however, does not turn on a cell phone subscriber's prior express consent—a requirement for TCPA liability—but instead depends only on whether a person received a phone call from Quality after placing an online order on Stompeez's website, and was marketed Sempris' products. (R. 372, Nov. 17, 2017, Mot. for Class Certification at 1-2.) Thus, the Court rules that Toney's class is sufficiently definite and ascertainable for purposes of class certification.

Defendants argue that Toney fails to show her class is ascertainable because she does not demonstrate how it is possible to match the cell phone numbers from Quality's outgoing call logs to the person who actually received Quality's calls. (R. 382, Resp. at 15 ("Absent a feasible and reliable method to identify the subscribers and cellular numbers included within the definition, certification is improper.").) This argument misapprehends the law of the Seventh Circuit, which imposes no such burden to establish ascertainability. *See Mullins*, 795 F.3d at 657-58; *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014) (noting that limiting class certification "only to those person's whose membership can be proved by reference to some other party's records is fundamentally unfair to potential class members" and "would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct").

Defendants cite to *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 109 (N.D. Ill. 2013), in support of their argument, but that case was decided before *Mullins*,[11] and, consequently, is not persuasive on the issue of the proposed class' ascertainability.[12] Additionally, in *Jamison*, the court reasoned that because the defendants presented specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cell phone, the proposed class would be overly broad and include too many plaintiffs with no TCPA claim. *Jamison*, 290 F.R.D. at 107-08. Here, Defendants provide no such evidence. Instead, they advance only legal arguments, claiming that a class member's consent raises an individualized issue the Court must resolve as to each class member, but that inquiry goes to the issues of commonality and predominance, which are discussed in more detail below. (R. 382, Resp. at 12-27.) Thus, *Jamison* does not apply to this case on the issue of ascertainability.[13]

---

[11] *Jamison* also applied a clear and convincing burden of proof, though a preponderance of the evidence burden of proof applies here. *Compare Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 109 (N.D. Ill. 2013) ("Therefore, [the plaintiff] has failed to establish by clear and convincing evidence that the class is ascertainable."), *with Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015) ("The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence.").

[12] *Wallace v. Chicago Housing Authority*, 224 F.R.D. 420 (N.D. Ill. 2004), also cited in Defendants' response, was also decided before *Mullins*. (R. 382, Resp. at 11.)

[13] The Court further notes that Defendants' concerns related to identifying individual class members goes more to Rule 23(b)(3)'s requirement that a class action be superior to other methods of adjudication. The Court, therefore, addresses these concerns in its analysis on Rule 23(b)(3)'s superiority requirement.

Defendants also maintain that the class is not ascertainable because Toney fails to establish that the proposed class members have Article III standing.[14] However, "such a possibility or indeed inevitability does not preclude class certification[.]" *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). While it is true "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant," Defendants fail to submit evidence showing that the proposed class members were not harmed by Defendants' conduct. *See Messner*, 669 F.3d at 825 (citation omitted). Loss of time and privacy responding to unsolicited communications are concrete injuries that confer Article III standing, and the record shows that the proposed class members lost time and privacy as a result of Quality's telemarketing campaign. *Griffith v. ContextMedia, Inc.*, 235 F. Supp. 3d 1032, 1034 (N.D. Ill. 2016) ("Courts in this district have held, both before and after the [Supreme] Court's decision in *Spokeo* . . . that loss of time and privacy are concrete injuries for the purpose of conferring Article III standing."); *see also Aranda v. Caribbean Cruise Line, Inc.*, 202 F. Supp. 3d 850, 858 (N.D. Ill. 2016) (rejecting argument that plaintiffs lacked standing because "Congress has identified that such unsolicited telephonic contact constitutes an intangible, concrete harm, and plaintiffs have alleged such concrete harms that they, themselves suffered"). Toney's proposed class, then, does not fail for being too indefinite or difficult to ascertain.

---

[14] To the extent Defendants rely on *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), *as revised* (May 24, 2016), that case is directed towards standing as to named plaintiffs, not class members, and Judge Shadur already determined that the named plaintiff in this class has standing, (R. 278, Tr. at 2-8; R. 326, Min. Entry). *See* 136 S. Ct. at 1547 n.6 ("That a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.' " (citation and internal alteration omitted)). Additionally, Defendants concede that the named plaintiff in this case, Toney, has standing. (R. 382, Resp. at 12 n.6. ("The Court, however, has already ruled that Plaintiff's pleading meets the *Spokeo* standard. And Seventh Circuit precedent . . . supports the Court's reasoning.").) The Court declines to revisit Judge Shadur's decision on Toney's Article III standing at this time without any indication that circumstances related to Toney's standing have changed.

## II.     Rule 23(a) Requirements

Having addressed the threshold issue of ascertainability, the Court turns to the requirements of Rule 23(a) and 23(b)(3). *See Wal-Mart*, 564 U.S. at 345; FED. R. CIV. P. 23. First, the Court addresses whether the proposed class satisfies the requirements in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See Bell*, 800 F.3d at 373; FED. R. CIV. P. 23(a).

### A.     Numerosity

Defendants do not argue that Toney fails to establish numerosity, which requires her to show that the "class is so numerous that joinder of all members is impracticable[.]" FED. R. CIV. P. 23(a)(1). Toney has shown that the class would include thousands of persons. (R. 373-3, Quality "Complaint Chart"; R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 8-9; R. 379, Class List.) Such a number of plaintiffs makes joinder of all class members impracticable and is enough to satisfy Rule 23(a)'s numerosity requirement. *See Olson v. Brown*, 284 F.R.D. 398, 407 (N.D. Ind. 2012) (class of 546 enough to satisfy Rule 23(a)'s numerosity requirement); *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 341 (N.D. Ill. 2010) (collecting cases where numerosity requirement was satisfied when classes were as low as 18 members and as high as 150 members). Toney, therefore, satisfies Rule 23(a)(1)'s numerosity requirement.

### B.     Commonality

Commonality requires that "there are questions of law or fact common to the class[.]" FED. R. CIV. P. 23(a)(2). Commonality also "requires the plaintiff to demonstrate that the class members have suffered the same injury" and that their claims "depend upon a common contention . . . capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 349-50. "Although a court need only find a single common question of

24

law or fact . . . the mere occurrence of all plaintiffs suffering as a result of a violation of the same provision of law is not enough." *Bell*, 800 F.3d at 374.

For example, in *Mullins*, commonality was satisfied where the common question of whether the defendant's statements concerning its product were false or misleading would resolve an issue that was central to the validity of each one of the putative class members' claims. 795 F.3d at 673. By contrast, in *Bolden v. Walsh Construction Co.*, 688 F.3d 893, 898 (7th Cir. 2012), there was no commonality because the plaintiffs alleging racial discrimination by their employer, a construction company, failed to identify a policy of discrimination that occurred across all of the company's construction sites, which would require the court to determine whether the manager at each construction site practiced racial discrimination against the employees.

Toney seeks certification of the class as to her claims that: Defendants violated the TCPA by using an ATDS to call cell phones; Mercuris is personally liable for Quality's conduct; and Defendants are contractually obligated to fund the Sempris settlement and pay Sempris' attorney's fees. (R. 313, Fourth Am. Compl. ¶¶ 114-181; R. 372, Nov. 17, 2017, Mot. for Class Certification at 16-17. [15]) Defendants do not argue that Toney fails to satisfy Rule 23(a)'s

---

[15] Toney does not seek certification of a class that covers persons on the "Do Not Call Registry," (R. 313, Fourth Am. Compl. ¶¶ 99-113), but "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." FED. R. CIV. P. 23(c)(4); *see also Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 445 (7th Cir. 2015) ("Rule 23(c)(4) permits the court to certify particular issues for resolution as a class action."); *Jacks v. DirectSat USA, LLC*, No. 10-CV-1707, 2015 WL 1087897, at *6 (N.D. Ill. Mar. 10, 2015) ("[A] class may be certified as to particular issues concerning liability even if the claim as a whole does not meet the predominance requirement of Rule 23(b)(3)."). Thus, the Court may certify for class treatment all of Toney's claims except for the claim seeking redress for calls to persons on the "Do Not Call Registry."

commonality requirement,[16] and the Court finds that Toney has presented enough evidence to clear this hurdle.

Toney has demonstrated by a preponderance of the evidence that each member in the class suffered the same injury—loss of time and privacy due to Quality's calls to their cell phones marketing a Sempris product. (R. 251-3, Quality 30(b)(6) Dep. Tr. at 16-17 ("A. . . . we offer Sempris to everybody first. Q. Every call that you make? A. Every—yes, every—every order confirmation that—that is good."), 73-74, 91-98, 113 ("we've used the same script for so long); R. 373-1, Telemarketing Script; R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 8-9; R. 379, Class List.) Toney has also demonstrated that these calls were made using the same type of device. (R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 7-8, 12.) The claims attempting to hold Mercuris personally liable for Quality's conduct also raise questions common to all proposed class members, because any unlawful depletion of Quality's assets to avoid a judgment would affect all class members the same. Similarly, Toney's claim that Quality is responsible for funding the Sempris settlement and paying Sempris' attorney's fees does not raise any problems related to commonality. This claim will depend on contractual obligations between Sempris and Quality rather than on any proof individual to particular class members.

Quality's and Mercuris' conduct therefore raise common questions, the truth or falsity of which would resolve the claims in this case in one stroke. For example, did Quality call cell phone numbers using an ATDS to market Sempris products (Count II)? Did Mercuris

---

[16] Defendants argue that issues individual to each class member predominate over issues that are common to the class. (R. 382, Resp. at 15-27.) While their arguments are directed towards Rule 23(b)(3)'s predominance requirement, this requirement is similar to Rule 23(a)'s commonality requirement. *Messner*, 669 F.3d at 814; *see also Wilkins v. Just Energy Grp., Inc.*, 308 F.R.D. 170, 184 (N.D. Ill. 2015), *on reconsideration in part*, 171 F. Supp. 3d 798 (N.D. Ill. 2016) ("Predominance and commonality are related but the predominance criterion is far more demanding." (citation and internal quotation marks omitted)). The Court, therefore, addresses these arguments in its analysis on predominance.

fraudulently transfer Quality's assets to herself (Count III)? Can Quality's corporate veil be pierced in order to hold Mercuris personally liable for Quality's conduct (Count IV)? Can Plaintiffs hold Quality responsible for paying Sempris' attorney's fees and funding the Sempris Settlement (Count V)? Accordingly, the Court concludes that Plaintiff has satisfied Rule 23(a)(2)'s commonality requirement. *See Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 224 (N.D. Ill. 2016) (finding the commonality requirement satisfied in TCPA case where "[e]ach class member suffered roughly the same injury: receipt of at least one phone call . . . to her cell phone" and determining the truth or falsity of common contentions would resolve issues central to the validity of each claim).

### C. Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [the plaintiff's] claims are based on the same legal theory." *Oshana*, 472 F.3d at 514 (citation, internal quotation marks, and alteration omitted). "Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (citation and internal quotation marks omitted). As noted above, Toney has shown by a preponderance of the evidence that she shares claims that are typical to each proposed class member because she received a call from Quality to her cell phone marketing a Sempris product, like the other proposed class members. Thus, Toney's claims are typical of the class members' claims given that her claim has the same essential characteristics as the class at large. *Kolinek v.*

*Walgreen Co.*, 311 F.R.D. 483, 491-2 (N.D. Ill. 2015) (hereinafter *Kolinek II*)[17] (ruling that

typicality was satisfied in a TCPA case where the named plaintiff received the same type of

phone call as the other class members).

### D.  Adequacy of Representation

Adequacy of representation requires that "the representative parties will fairly and

adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Defendants do not contest

adequacy of representation, and the Court finds that the proposed class satisfies this requirement.

"[A]dequacy of representation is composed of two parts: the adequacy of the named plaintiff's

counsel, and the adequacy of representation provided in protecting the different, separate, and

distinct interest of the class members." *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584,

598 (7th Cir. 1993); *see also Spano v. The Boeing Co.*, 633 F.3d 574, 586-87 (7th Cir. 2011)

(analyzing the competence of counsel and whether counsel would have a conflict of interest with

any class member). "A class is not fairly and adequately represented if class members have

antagonistic or conflicting claims." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

For example, "[a] named plaintiff who has serious credibility problems or who is likely to devote

too much attention to rebutting an individual defense may not be an adequate class

representative." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir.

2011).

Upon review of Toney's attorneys' declarations and their performance in the case thus

far, (R. 372-8, Counsel Decls.), the Court is satisfied that Toney's counsel is competent and has

enough resources to prosecute this action. Toney's counsel also has significant experience with

class action and TCPA litigation as well as knowledge of the applicable law. *See* FED. R. CIV. P.

---

[17] The Court refers to this case hereinafter as "*Kolinek II*" so as not to confuse it with *Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014).

23(g). The Court also finds that, because of the factual similarities between Toney's and the proposed class members' claims described above, Toney's and the proposed class members' interests are sufficiently aligned and free of internal conflicts so that they do not pose any problems related to adequacy of representation. *See Kolinek II*, 311 F.R.D. at 492 (plaintiffs satisfied adequacy of representation prong in TCPA case where there was "no evidence on the record to suggest, that [the named plaintiff's] interests [were] adverse to those of the . . . class" and class counsel "performed satisfactorily on behalf of the class and . . . demonstrated their competence in representing the class's interests"). Accordingly, the Court concludes that Toney has established adequacy of representation.

## III. Rule 23(b)(3) Requirements

Having determined that Toney's proposed class satisfies all of Rule 23(a)'s requirements, the Court now evaluates whether it satisfies any one of the three requirements in Rule 23(b). As noted, Toney requests certification pursuant to Rule 23(b)(3), (R. 382, Resp. at 19), which requires her to establish that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Defendants dispute that Toney's proposed class meets either requirement, so the Court addresses each in turn.

### A. Predominance

Rule 23(b)(3)'s predominance requirement is related to commonality but "far more demanding." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation and internal quotation marks omitted). "This calls upon courts to give careful scrutiny to the relation

29

between common and individual questions in a case." *Id.* "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Id.* (citation, internal quotation marks, and alteration omitted). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (citation and internal quotation marks omitted); *see also Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016) ("Predominance is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." (citation, internal quotation marks, and alteration omitted)), *cert. denied*, 137 S. Ct. 1582 (2017). If "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045 (citation omitted). "[P]redominance requires a qualitative assessment . . .; it is not bean counting." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

The Court finds that Toney has shown by a preponderance of the evidence that common questions predominate in this case because, as noted above in the Court's analysis on commonality, all members of the proposed class suffered the same injury and were generally subjected to the same telemarketing campaign by the same Defendant using the same automated dialer. (R. 251-3, Quality 30(b)(6) Dep. Tr. at 16-17, 73-74, 91-98, 113; R. 373-1, Telemarketing Script (indicating that Quality generally used the same protocol when contacting Stompeez

customers to market Sempris products); R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 12 (Quality indicating that it used the same automated dialer across the class).) Defendants' primary arguments against predominance concern (1) their affirmative defense of consent, and (2) other ancillary issues that they argue are individual to each class member and incapable of class-wide determination, such as: whether Defendants acted "willfully" or "knowingly;" whether Mercuris can be held liable for Quality's actions; and whether the automated dialer Quality used is an ATDS within the meaning of the TCPA. (R. 382, Resp. at 15-29.) The Court addresses these arguments separately below.

### 1. Consent

Defendants contend that Toney cannot satisfy the predominance requirement because the TCPA requires the class to prove that Quality made a call "without *the prior express consent* of the recipient," and whether a class member consented to Quality's calls is an individualized, fact-intensive inquiry. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 798 (7th Cir. 2017) (emphasis added). Their consent argument is twofold: (a) that consent requires factual determinations particular to each class member, (R. 382, Resp. at 12-27); and (b) that deciding issues of consent requires the Court to apply different legal standards of consent depending on the date a particular class member received a call from Quality, (*id.* at 17-21). The Court disagrees with both arguments.

### a. Whether Consent Requires Individualized Factual Determinations

"Courts determine whether issues of individualized consent defeat commonality and predominance in . . . TCPA cases on a case-by-case basis after evaluating the specific evidence available to prove consent." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 725 (N.D. Ill. 2016). "Generally, when the defendant provides specific evidence showing that a significant percentage of the putative class consented to receiving calls, issues of

individualized consent predominate." *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017); *Mauer v. Am. Intercontinental Univ., Inc.*, No. 16 C 1473, 2016 WL 4698665, at *4 (N.D. Ill. Sept. 8, 2016) ("Issues of individualized consent typically predominate when a defendant sets forth specific evidence showing consent from a large percentage of potential class members and the plaintiff has not presented a method by which to ascertain consent on a class-wide basis."). Alternatively, where the defendant "fails to set forth this specific evidence and instead only makes vague assertions about consent, then individualized issues regarding consent will not predominate over common questions of law or fact so as to prevent class certification." *Physicians Healthsource, Inc.*, 318 F.R.D. at 725 (citation and internal alterations omitted). "While it is plaintiff's burden to meet the predominance test," opposition to predominance "based on theory, not evidence, is not a weighty objection." *Johnson v. Yahoo!, Inc.*, No. 14 CV 2028, 2016 WL 25711, at *7 (N.D. Ill. Jan. 4, 2016).

For example, in *Legg v. PTZ Insurance Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017), the court ruled that the proposed class failed to meet Rule 23(b)(3)'s predominance requirement because the defendants submitted affidavits from a number of proposed class members who "agreed to and expected to receive calls on their [cell] phones from defendants," and therefore "the trial in [the] case [would] be consumed and overwhelmed by testimony from each individual class member . . . to determine whether the class member consented to receive the calls in question[.]"

On the other hand, if the defendant obtained the class members' consent for calls in a uniform manner, consent can be resolved on a class-wide basis. *See Wilkes v. CareSource Mgmt. Grp. Co.*, No. 4:16-CV-038 JD, 2016 WL 7179298, at *7 (N.D. Ind. Dec. 9, 2016) (observing that the "predominance requirement [is] met where the defendant collect[s] . . . phone numbers in

a common manner" and reasoning that consent could be resolved on a class-wide basis if the plaintiffs provided their consent through standardized forms). For example, in *Kolinek II*, the court ruled that the proposed class satisfied Rule 23(b)(3)'s predominance requirement because a common question to the class included whether, as a matter of law, providing a cell phone number for identity verification purposes constituted consent to receive prescription refill reminder calls. *Kolinek II*, 311 F.R.D. at 492-93.

In addition, when a defendant fails to provide any evidence that the class members' consent to phone calls poses an individualized question particular to a significant percentage of the proposed class, the consent issue does not defeat predominance. *Buonomo*, 301 F.R.D. at 298-99. In *Buonomo*, for example, the court ruled that the defendant's affirmative defense of consent was insufficient to defeat class certification because the defendant argued that consent raised a question individual to each class member, yet it failed "to present any specific evidence—as opposed to mere speculation—that this purportedly individualized issue predominate[d] over common issues." *Id.*; *see also G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *5 (N.D. Ill. Aug. 20, 2009) ("[The defendant] cannot defeat class certification by asserting the vague possibility that some of the individuals on the anonymous lists may have perchance consented[.]").

Defendants' evidence related to consent in this case is limited to the privacy policy on Stompeez's website and a section in Stompeez' online order form that requested customers' telephone numbers "for questions about [the] order." (R. 149, Pl.'s Resp. to Defs.' Statement of Material Facts at 2-3; R. 329, Answer to Fourth Am. Compl. ¶ 37; R. 382, Resp. at 5-6.) Defendants, however, do not provide any evidence showing that the privacy policy or Stompeez's online order form was understood differently among the proposed class members, or

that the privacy policy or order form materially differed as to particular class members. Thus, this case is like *Buonomo* where issues of consent do not defeat predominance because the defendant failed to provide any evidence that litigating issues of consent would require different proof or separate trials for individual class members. 301 F.R.D. at 298-99; *see also Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1126 (6th Cir. 2016) (holding that "the mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)" and that "allowing such speculation to dictate the outcome of a class-certification decision would afford litigants in future cases wide latitude to inject frivolous issues to bolster or undermine a finding of predominance." (citation omitted)), *cert. denied*, 138 S. Ct. 80 (2017); *A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*, No. 16 C 2513, 2018 WL 488257, at *4 (N.D. Ill. Jan. 18, 2018) ("[The defendant] has not presented any specific evidence of consent by any class member and argues instead that the very specter of possible consent by any class member demands an individualized inquiry too burdensome for the [c]ourt to bear if it certifies [the plaintiff's] proposed class. Case law disapproves of [the defendant's] reasoning.").

Additionally, the facts related to each class member's interaction with Stompeez's privacy policy and online order form is uniform throughout the class. The current record before the Court indicates that the privacy policy and online order form on Stompeez's website did not change during the time period covering the proposed class, and that the privacy policy, at all relevant times, was available via a hyperlink on Stompeez's website. (*See* R. 149, Pl.'s Resp. to Defs.' Statement of Material Facts at 2-3; R. 258-1, Toney Dep. Tr. at 37-39, 44, 48-50, 89-90, 167-68; R. 382, Resp. at 22-23 (failing to directly address Toney's factual assertion that "each class member entered a phone number on the same web page, each of them subject to the same vulnerabilities in their defense").) Thus, like in *Kolinek II*, this case presents a pattern of alleged

consent that is uniform across the class and amenable to class-wide resolution. *See* 311 F.R.D. at 492-93 ("[C]ommon questions at the heart of this class's suit against Walgreens include whether, as a matter of law, providing a cellular telephone number for verification purposes constitutes prior express consent to receive prescription refill reminder calls; whether, as a matter of law, prescription reminder calls fall under the TCPA's emergency purpose exception; and if not, whether, as a matter of fact, Walgreens placed prerecorded or automated prescription refill reminder calls to those cellular phones.").

At bottom, common questions predominate with respect to the issue of consent, namely, whether under the TCPA: (1) a privacy policy hyperlinked to a website constitutes a person's consent to receive telemarketing phone calls if a person orders a product on that website; and (2) providing one's cell phone number for questions about her order results in her consent to receive telemarketing calls unrelated to her order. Accordingly, the Court concludes that predominance is satisfied in this case. *See Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 WL 193560, at *3 (E.D. Mo. Jan. 18, 2017) ("Whether consent to call about religious freedom is also consent to receive calls about a movie is a legal question which can be resolved on a class-wide basis and does not require individual inquiry. There is no evidence class members consented in other ways which would require individualized analysis."); *Stern v. DoCircle, Inc.*, No. SACV 12-2005 AG JPRX, 2014 WL 486262, at *3 (C.D. Cal. Jan. 29, 2014) (issues of consent in TCPA case failed to defeat class certification because the defendant's evidence of consent did not "differ between putative class members, and the [c]ourt's evaluation of it [would] apply to all class members equally" and should "the parties present a multitude of individualized evidence on consent . . . that evidence might make a class action unwieldy, . . . the Court [could] revisit whether class certification is proper").

The legal authority that Defendants rely upon to defeat predominance is unpersuasive. In the first case they rely on, *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008), a TCPA case involving advertisements sent via fax, the court ruled that the issue of consent would require individual determinations as to each class member because "the evidence show[ed] that some of the fax advertisements . . . sent were solicited by the recipients, but which ones c[ould] only be decided on a case-by-case basis." In contrast to *Gene And Gene*, Defendants present no evidence showing that their method of obtaining consent differed among class members. Instead, as noted above, Defendants' consent argument hinges on language from an online order form and privacy policy common to all class members. *Gene And Gene* itself suggests that in such situations involving generalized proof, class certification would be appropriate. *See id.* at 329 ("[W]e do not hold as a matter of law that the consent requirement in the case before us defeats the possibility of class certification. We merely hold that [the plaintiff] has failed to advance any viable theory employing generalized proof concerning the lack of consent with respect to the class involved in this case[.]").

The second case Defendants rely on is *Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016). In *Sgouros*, the court observed that a "browsewrap" agreement is an agreement in which "users are bound to its terms by merely navigating or using a website," and further noted that such an agreement is enforceable when there is actual or constructive knowledge of the "browsewrap" agreement's terms. *Sgouros*, 2015 WL 507584 at *6. Defendants argue that the privacy policy is a "browsewrap" agreement as described in *Sgouros*, requiring individual determinations of the class members' actual or constructive knowledge of the privacy policy to decide whether it is enforceable against particular class members. (R. 382, Resp. at 21-24.) Even if the privacy policy

is a "browsewrap" agreement, Defendants present no evidence that Toney or any of the putative class members had actual notice of the privacy policy, and the record developed to date suggests that at least some did not. (*See, e.g.*, R. 258-1, Toney Dep. Tr. at 44 ("Q. And was there a hyperlink to a privacy page? A. Not that I saw. . . . Q. Did you read any privacy policy before you clicked to order now? A. No.").)[18] Thus, under *Sgouros*, based on the evidence presented thus far and assuming that a "browsewrap" agreement is a valid form of consent under the TCPA,[19] the Court would only need to determine whether class members had constructive notice of the privacy policy. *Sgouros*, 2015 WL 507584, at *6. The Court could resolve this issue in a class action because constructive notice of a "browsewrap" agreement looks at the conspicuousness of the hyperlink or text constituting the agreement. *See Sgouros*, 2015 WL 507584, at *6. All of the proposed class members in this case used the same website, and any inquiry as to constructive knowledge of the privacy policy would be the same across the proposed class.[20] As a result, *Sgouros* does not support Defendants' argument that individual issues predominate.

Defendants also liken this case to *Clark v. Experian Information Solutions, Inc.*, 256 F. App'x 818 (7th Cir. 2007), in which the Seventh Circuit affirmed a district court's denial of class certification. That case, however, involved a claim under the Illinois Consumer Fraud and

---

[18] Without any evidence of actual consent to the privacy policy, Defendants cannot rely on this argument to defeat class certification. *A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*, No. 16 C 2513, 2018 WL 488257, at *4 (N.D. Ill. Jan. 18, 2018).

[19] The TCPA standard for consent is discussed below and does not incorporate the same exact principles of actual and constructive of notice from "browsewrap" agreement jurisprudence.

[20] Even then, Defendants fail to present any evidence showing that the proposed class members had constructive notice of the privacy policy's terms, and they concede that the privacy policy was not "prominently displayed" on Stompeez's website. (R. 382, Resp. at 26.) Defendants cannot defeat class certification by relying on such bare argument and speculation without any supporting evidence. *See A Custom Heating & Air Conditioning, Inc.*, 2018 WL 488257, at *4.

Deceptive Business Practices Act ("ICFA"), 815 ILL. COMP. STAT. 505/2, which requires proof of proximate cause. *Clark*, 256 F. App'x at 821. The court in *Clark* reasoned that "it is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, in some manner, deceived" by the defendant's misrepresentation, and "[s]atisfaction of this element requires individualized proof." *Id.* As indicated by the cases cited above, however, the issue of consent in TCPA cases is unlike the issue of proximate cause in ICFA cases such as *Clark*, because consent may be determined on a class-wide basis and typically only defeats predominance if it requires individualized proof. *E.g., A Custom Heating & Air Conditioning, Inc.*, 2018 WL 488257, at *4; *Buonomo v*, 301 F.R.D. at 298-99 (N.D. Ill. 2014); *G.M. Sign, Inc.*, 2009 WL 2581324, at *5. Consequently, Defendants' cases do not persuade the Court that Toney's proposed class fails to satisfy Rule 23(b)(3)'s predominance requirement.

### b. Whether the Court Must Apply Different Legal Standards for Consent

With respect to Rule 23(b)(3)'s predominance requirement, Defendants argue that the Federal Communications Commission's ("FCC") orders interpreting the meaning of "prior express consent" under the TCPA govern, and that the TCPA has changed its interpretation of "prior express consent" during the period in which the class members received calls from Quality. (R. 382, Resp. at 17-21.) Thus, according to Defendants, a class action would require the Court to apply different legal standards for consent to different class members. (*Id.* at 15.) A review of the FCC's orders and applicable case law, however, compels the opposite conclusion.

Defendants are correct that, pursuant to the Hobbs Act, 28 U.S.C. § 2342(1), the FCC's interpretation of "prior express consent" is binding on this Court. *See CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010) (ruling that district courts lack jurisdiction to consider whether to enforce an FCC order); *Zeidel v. A&M (2015) LLC*, No. 13-CV-6989, 2017

WL 1178150, at *9 (N.D. Ill. Mar. 30, 2017) ("[T]his Court must follow the FCC's interpretations of the TCPA."). The FCC's interpretation of "prior express consent," however, has not changed in a way that would require the Court to apply different legal standards to different subsets of the class. Toney's proposed class includes individuals whom Quality called from "January 3, 2009, through the date of preliminary approval." (R. 372, Nov. 17, 2017, Mot. for Class Certification at 13.) The FCC's interpretation of "prior express consent" under the TCPA throughout this time period has been that "the scope of a consumer's consent depends on its context and the purpose for which it is given." *Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014). Under this standard, the Court could make a class-wide determination as to the scope of the proposed class members' consent because the context and purpose for which they provided their cell phone number is the same across the class.

In *Kolinek*, the court reviewed the FCC's interpretation of "prior express consent" from FCC Orders issued in 1992, 2008, 2012, and 2014, and concluded that "[t]he FCC has established no general rule that if a consumer gives his cellular phone number to a business, she has in effect given permission to be called at that number for any reason at all, absent instructions to the contrary." *Kolinek*, 2014 WL 3056813, at *4. The court further concluded that "to the extent the FCC's orders establish a rule, it is that the scope of a consumer's consent depends on its context and the purpose for which it is given." *Id.* "Consent for one purpose does not equate to consent for all purposes." *Id.* The Seventh Circuit and many courts in this District agree with *Kolinek*'s interpretation of the FCC's orders. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 805 (7th Cir. 2017) ("The rule the district court judge reached in *Kolinek* was that the FCC 'considers the scope of a consumer's consent to receive calls to be dependent on the context in which it is given[,] . . . a rule in complete harmony with the one we apply today."); *Brodsky v.*

*HumanaDental Ins. Co.*, 269 F. Supp. 3d 841, 846 (N.D. Ill. 2017) (citing *Kolinek* approvingly and observing that "[a]s a doctrinal matter, consent is dependent on the context in which it is given." (citation omitted)); *Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1064 (N.D. Ill. 2016) ("This court is persuaded by the analysis in *Kolinek* and applies it here.").

Defendants, relying on *Reardon v. Uber Technologies, Inc.*, 115 F. Supp. 3d 1090, 1097-99 (N.D. Cal. 2015), argue that the FCC's 1992 order, *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 ¶ 31 (Oct. 16, 1992), is "crystalline" and stands for the proposition that any person who voluntarily provides her cell phone number has consented to be contacted by telemarketers "for *any* purpose." (R. 382, Resp. at 19 (emphasis added).) Aside from being an out-of-Circuit case, *Reardon* did not address issues related to the scope of one's consent to receive phone calls, and the *Reardon* court merely distinguished *Kolinek* on its facts: "[t]he *Kolinek* court acknowledged that the 1992 FCC Order equated the giving of a phone number with consent to be contacted at that number, but held that plaintiffs there had adequately alleged that the texts they received exceeded the scope of the consent they had provided the defendant." *Reardon*, 115 F. Supp. 3d at 1098. Indeed, the court in *Reardon* ultimately concluded that "any plaintiff who provided her phone number as part of the Uber application process consented to receive Uber's texts *about becoming an Uber driver*," not for any purpose. *Id.* at 1099 (emphasis added). Additionally, the U.S. Court of Appeals for the Ninth Circuit, whose decisions bound the court in *Reardon*, has since ruled that "[t]aking into account the statutory language that prior consent must be 'express' and the TCPA's legislative history, *we do not read the 1992 Order to mean that the FCC has determined that providing a phone number in itself means that the consumer has expressly consented to contact for any purpose whatsoever.*" *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1045 (9th Cir. 2017)

(emphasis added). "Instead, the consent must be considered to relate to the type of transaction that evoked it." *Id.*

Accordingly, whether the class members consented to Quality's call will depend, for all class members, on the context and the purpose for which their phone number was given, and Toney has established by a preponderance of the evidence that all class members provided their telephone number in the same context and for the same purpose—through Stompeez's online order form to purchase a product from Stompeez's website. *See Kolinek*, 2014 WL 3056813, at *4 (vacating on reconsideration the court's prior dismissal of the plaintiff's complaint based on the FCC's 1992 Order and reasoning that the plaintiff, who gave his phone number to the defendant for "identity verification purposes" sometime between 2002 and 2012, sufficiently alleged that he did not consent to calls reminding him to refill his prescription); *Blow*, 855 F.3d at 804 (reasoning that "an effective consent is one that relates to the same subject matter as is covered by the challenged calls or text messages" in a case involving texts to class members' cell phones from as early as 2009 (citation omitted)). The Court, therefore, concludes that Toney has established predominance, and the Court's conclusion is not altered by Defendants' affirmative defense of consent.

### 2. Defendants' Other Arguments Against Predominance

Defendants argue that other individualized questions destroy predominance, which include: (1) whether Defendants' conduct was "willful" or "knowing"; (2) whether Mercuris is personally liable for Quality's conduct; and (3) Toney's claimed failure to show that Quality's automated dialer is an ATDS within the meaning of the TCPA.

The first two arguments are related to Defendants' contention that FCC orders interpreting consent under the TCPA differed from 1992 to 2013. (R. 382, Resp. at 27.)

Defendants, however, do not explain how the FCC orders at issue require individual determinations for particular class members as to whether Defendants' conduct was "willful" or "knowing" or whether Mercuris can be held personally liable. Defendants also claim that whether Defendants acted willfully or knowingly affects the amount of damages, but "[t]he fact that the plaintiffs might require individualized relief . . . does not preclude certification of a class," especially where Defendants do not even articulate how the amount of damages would vary among class members. *See Bell*, 800 F.3d at 379; *see also Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008) ("Although the extent of each class member's personal damages might vary, district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts."). In addition, Toney has shown, for purposes of class certification, that Quality obtained the class members' cell phone numbers in the same way, and called each class member pursuant to the same company protocol or script. (R. 251-3, Quality 30(b)(6) Dep. Tr. at 16-17, 73-74, 91-98, 113; R. 373-1, Telemarketing Script.) Thus, whether or not Defendants acted willfully or knowingly can be decided on a class-wide basis because Defendants generally acted in the same manner towards all class members.

Whether Mercuris can be held personally liable is not dependent on any individualized proof from the class members, but on a corporate veil-piercing theory that would generally look to Mercuris' dominion and control of Quality, Mercuris' use of Quality's corporate form for an improper purpose, and any fraudulent or improper use of the corporate form that injured the class members. *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008).[21] These

---

[21] Quality is a Florida corporation, and therefore Florida law would likely control the veil-piercing analysis. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008) ("Texas has the same choice-of-law rule for veil-piercing claims as Illinois, namely that the law of the state of incorporation governs such claims.).

inquiries require proof that is individual to Quality and Mercuris, not any of the class members, and therefore do not weigh against a finding of predominance.

Defendants' last argument against predominance is that Toney fails to prove that Quality's automated dialer qualifies as an ATDS as that term is understood by the TCPA. (R. 382, Resp. at 27-29.) Defendants maintain, without citing to any record evidence, that "it is possible that the Dialer at times during the class period had present capacity" to function as an ATDS "and at other times it did not," which would sweep into the class individuals who "lack standing, rendering the proposed class definition indefinite and creating an individual issue that would predominate over a common question of ATDS use." (*Id.* at 29.) Even if this argument's factual premise is true and not just "possible," it does not affect class certification. The operative question is not whether Quality's automated dialer had the capacity to function as an ATDS, but whether it was an ATDS at the time Quality used it to call cell phones. *Blow*, 855 F.3d at 798 ("[T]he TCPA prohibits making any call without the prior express consent of the recipient using any automated telephone dialing system ('autodialer') to any telephone number assigned to a paging service or cellular telephone service." (citation and internal alteration omitted)); *see also Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727 (N.D. Ill. 2011) (focusing on whether the defendant's device was an ATDS by looking at whether it automatically dialed numbers from a stored database and then routed those calls to the defendant's representatives). Defendants point to no record evidence showing that Quality used different automated dialers for calls to different persons. Nor does Defendants' expert lend any support to Defendants' argument that the ATDS issue requires individualized determinations. His opinion on this matter is confined to three bullet points arguing that Toney's expert offers no evidence showing that Quality used an ATDS. (R. 345-1, Sponsor Report at 8.) That argument, however, goes to

Plaintiffs' ultimate success on the merits and not whether individual issues predominate over common ones, which is the only relevant inquiry on class certification.

In addition, the record developed to date shows that Defendants used the same automated dialer for its telemarketing campaign to sell Sempris' products. (R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 12 ("Identify all dialers and dialing systems you used to call any person responsive to interrogatory 1.[22] . . . **RESPONSE:** . . . Quality uses VICI Dial, an open source dialing platform. The dialers are custom built[.]").) The question, then, is whether that device qualifies as an ATDS under the TCPA—either it does or does not, and this is a question common to all proposed class members. "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis in original). Thus, Toney has satisfied her burden of establishing predominance under Rule 23(b)(3).

## B.      Whether A Class Action is Superior to Other Methods of Adjudication

Rule 23(b)(3) permits class certification if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Considerations relevant to this inquiry are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3)(A)-(D); *see also Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 75 (N.D. Ill. 2016) (listing the same factors as "pertinent to superiority"). "[W]hen courts approach the issue

---

[22] These persons were defined to include: "[a]ll persons . . . who the Defendants . . . caused to be initiated telemarketing calls to cell phone . . . numbers, at any time on or January 3, 2009, where the purpose of included anything other than 'for questions about orders,' (e.g. telemarketing)." (R. 373-4, Quality's Resp. to Pl.'s First Disc. Reqs. at 11.)

as part of a careful application of Rule 23(b)(3)'s superiority standard, they must recognize both the costs *and benefits* of the class device[.]" *Mullins*, 795 F.3d at 663. Superiority "is comparative: the court must assess efficiency with an eye toward 'other available methods.' " *Id.* at 664. "Under this comparative framework, refusing to certify on manageability grounds alone should be the last resort." *Id.* "[A] district judge has discretion to . . . wait and see how serious the problem may turn out to be after settlement or judgment, when much more may be known about available records, response rates, and other relevant factors." *Id.* "And if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation." *Id.*

Taking into account these considerations, the Court concludes that they weigh in favor of class certification. There is no impediment related to "the class members' interests in individually controlling the prosecution or defense of separate actions" or "any litigation or controversy already begun by or against class members," as the record is lacking in evidence that another class member seeks to individually control a separate action or even that another class member has a separate action pending. *See* FED. R. CIV. P. 23(b)(3)(A)-(B). The "desirability or undesirability of concentrating the litigation of the claims in" this Court does not significantly weigh for or against certification; if anything, it slightly favors certification because Toney, the proposed class representative, resides within this District. (R. 313, Fourth Am. Compl. ¶8.) Because Quality has produced call logs listing the cell phone numbers it called,[23] and because common issues predominate and are subject to generalized proof, the Court finds that "the likely difficulties in managing a class action" are not so serious in this case as to justify denying certification. *See* FED. R. CIV. P. 23(b)(3)(D). Of course, if Toney and class counsel cannot, down

---

[23] Quality also notes that a search of its records "may identify who the intended recipient of a call was–i.e., the name entered on the Stompeez website[.]" (R. 382, Resp. at 14.) This further assuages the Court's concerns related to identification and management of the class members.

the road, propose a feasible solution for managing the litigation or for identifying and providing notice to class members, Defendants can move to decertify the class. *See Mullins*, 795 F.3d at 664.

The Court also finds that the benefits of adjudicating this case as a class action outweighs its costs in comparison to other methods of adjudication, because requiring several thousands of other lawsuits against Defendants would create unnecessary costs and burden. *Mullins*, 795 F.3d at 663-64. Most of the proposed class members in this case have a very minimal stake in the litigation and may not bother bringing individual actions. "Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but the injury is substantial in the aggregate." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006).

Defendants raise essentially the same arguments opposing superiority as they did for predominance. (*See* R. 382, Resp. at 26 ("Because of the overwhelmingly predominate individual questions relating to liability, Plaintiff cannot carry her burden on superiority or manageability.").) The Court rejects these arguments for the same reasons it rejected them in its analysis on predominance. Accordingly, the Court rules that Toney's proposed class satisfies Rule 23's requirements for class certification.

## CONCLUSION

For the foregoing reasons, Toney's motion for class certification (R. 372) is GRANTED. The class is defined as follows:

> All persons who are or were the subscribers of the telephone numbers on the Class List, and to whom, from January 3, 2009, through August 16, 2016, Quality Resources, Inc., made a call or calls through its Vicidial calling system to their cellular telephones promoting Sempris goods, and where the cell phone number was obtained as a result of their transaction at the website www.stompeez.com.

The following persons are excluded from the Class: Quality, any parent, subsidiary, or affiliate of Quality, Mercuris and the officers, directors, agents, servants or employees of Quality as of August 16, 2016, Class Counsel, and any judge presiding over the action.

The class claims to be tried are Counts II-V of the fourth amended complaint. Pursuant to Rule 23(g), Alexander H. Burke, Edward A. Broderick, Anthony I. Paronich, and Matthew P. McCue are appointed as class counsel. Sarah Toney, the named Plaintiff, is hereby designated as the class representative.

The parties are DIRECTED to appear for a status hearing on March 6, 2018, at 9:45 a.m., and are directed to exhaust all settlement possibilities prior to the hearing.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: February 12, 2018**